# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-09-00195-CR
NO. 03-09-00196-CR
NO. 03-09-00197-CR
NO. 03-09-00198-CR

**Robert Flores Samaniego Jr., Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT
NOS. CR-08-075, CR-08-076, CR-08-077 & CR-08-078
HONORABLE WILLIAM R. HENRY, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

In four cause numbers, a jury convicted appellant Robert Flores Samaniego, Jr. of the offense of aggravated assault with a deadly weapon, namely, a motor vehicle. Punishment was assessed at eighteen years' imprisonment for each conviction, with the sentences to run concurrently. In two points of error, Samaniego challenges the legal and factual sufficiency of the evidence supporting the deadly-weapon finding. We will affirm the judgments.

## BACKGROUND

We will review the evidence in detail when discussing Samaniego's points of error. Briefly, the jury heard testimony that on December 8, 2007, Samaniego and his girlfriend, Janie Hernandez, got into an argument while they were driving in her car, a Dodge Stratus, from

Austin to their home in San Marcos. Samaniego was driving the vehicle. When they arrived in San Marcos, Hernandez recalled, she and Samaniego stopped at a fast food restaurant so that she could use the restroom. Hernandez testified that as she was walking across the parking lot to the building, she heard tires screeching, turned around, and saw her car backing up toward her. According to Hernandez, her car struck her, knocking her to the ground, and then drove away.

Hernandez testified that she was then approached by four Texas State University students who offered to help her—Christopher Gunn, Maria Torres, Taylor Pickett, and Ronald Chapman. She asked the students to drive her to her cousin's apartment, and they agreed. Hernandez got into their car, a Dodge Caliber, and they drove away. Shortly thereafter, Hernandez noticed another car approaching them from behind. She turned around, got a look at the license plate, and realized that it was her car, being driven by Samaniego. At that point, Hernandez recounted, Samaniego called her on her cell phone and told her to tell the driver of the car in which she was riding to pull over or he would hit them. Gunn, the driver of the Caliber, declined to pull over and instead called 911 and reported what was happening. According to Hernandez and the students (all four of whom testified at trial), Samaniego then either struck, hit, or bumped their car from behind, continued to follow them for a short time, drove past them and stopped suddenly in front of them, and then pulled into the parking lot of DCI Biologicals, where Hernandez worked. Thereafter, the students and Hernandez drove to the police station, where they provided statements.

Samaniego was subsequently arrested and charged with the offense of aggravated assault with a deadly weapon. There were four indictments, one for each of the four students who

2

were alleged to be victims.[1]  Otherwise, the indictments were identical.  The case proceeded to trial, and Samaniego was found guilty as charged in each cause and sentenced.  This appeal followed.

## STANDARD OF REVIEW

In a legal sufficiency review, we consider whether, after viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found the elements of the offense beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  "This standard accounts for the factfinder's duty 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"  *Clayton*, 235 S.W.3d at 778 (quoting *Jackson*, 443 U.S. at 319).  It is not necessary that every fact point directly and independently to the defendant's guilt, but it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.  *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

In a factual sufficiency review, we consider whether, after viewing the evidence in a neutral light, a rational trier of fact was justified in finding guilt beyond a reasonable doubt.  *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).  A finding of guilt should be set aside only if the evidence supporting the finding is so weak as to render the finding clearly wrong or manifestly unjust.  *See id*. at 415; *Korell v. State*, 253 S.W.3d 405, 412 (Tex. App.—Austin 2008, pet. ref'd).  Therefore, we will not reverse a judgment on a factual sufficiency challenge unless we

---

[1]  In a separate trial court cause number, CR-08-0084, Samaniego was also charged with the offense of aggravated assault with a deadly weapon against Hernandez.  However, the jury found Samaniego not guilty of this offense.

can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the finding of guilt. *Watson*, 204 S.W.3d at 417.

## ANALYSIS

Samaniego asserts that the evidence is legally and factually insufficient to prove that the motor vehicle he used during the offense was a deadly weapon. According to Samaniego, "all the testimony about the car being a deadly weapon was purely hypothetical and based on pure speculation." In Samaniego's view, "there was no evidence that appellant was driving unsafely or that anyone was in danger of either serious bodily injury or death." We disagree.

The statutory definition of deadly weapon includes "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(B) (West Supp. 2009). "The provision's plain language does not require that the actor actually intend death or serious bodily injury; an object is a deadly weapon if the actor intends a use of the object in which it would be capable of causing death or serious bodily injury." *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). "The placement of the word 'capable' in the provision enables the statute to cover conduct that threatens deadly force, even if the actor has no intention of actually using deadly force." *Id.* Accordingly, "[t]he State is not required to show that the 'use or intended use causes death or serious bodily injury' but that the 'use or intended use is *capable* of causing death or serious bodily injury.'" *Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2008) (citing *McCain*, 22 S.W.3d at 503).

Objects that are not usually considered dangerous weapons may become so, depending on the manner in which they are used during the commission of an offense. *Drichas*

4

*v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005). A motor vehicle may become a deadly weapon if the manner of its use is capable of causing death or serious bodily injury. *Id*. Specific intent to use a motor vehicle as a deadly weapon is not required. *Id*. However, to sustain a deadly weapon finding, there must be evidence that others were "actually endangered" as opposed to there being a "hypothetical potential for danger." *Cates v. State*, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003). In making this determination, "first, we evaluate the manner in which the defendant used the motor vehicle during the felony; and second, we consider whether, during the felony, the motor vehicle was capable of causing death or serious bodily injury." *Sierra v. State*, 280 S.W.3d 250, 255 (Tex. Crim. App. 2009). One of the factors to consider in our analysis is whether the defendant's driving was reckless or dangerous. *See id*.

The evidence considered by the jury in making its deadly weapon finding included the testimony of Hernandez, some of which we have summarized above. The State elicited the following testimony from Hernandez concerning events after she got into the car with the four students:

> Q:      Well, what happened after you left [the restaurant]? Did you get in their car?
>
> A:      Yes, I got in their vehicle and as we were taking off we came onto [State Highway] 123, and we got on the [I-35] access road, going northbound, and then we saw a car get up real close to us from the back, and I turned around and I could see my license plate to my car. And that's when I noticed it was my car and it was Robert driving in the vehicle.
>
> . . . .
>
> Q:      Okay. What happened when you looked back and you saw your car immediately behind you?

5

A:     We like panicked.  And Robert had called me on my cell phone and he was telling me to tell them to pull over or he was going to hit us in the back of the vehicle if we didn't pull over so they could let me out.

Q:     What happened after that?

A:     We turned off on the access road, . . . .  And as we were on Cape Road, and [] there's a bridge there and after you pass the bridge, that's when Robert struck us with the vehicle and he hit us from behind.

Q:     Do you know about how fast you were going when your vehicle was struck?

A:     We were going I'd say about 30, 35 miles an hour, because we had just gone over the bridge.

Q:     How fast do you think Robert was going, if you know?

A:     I don't know.  We were going at least 30, 35.  It's probably about the same speed; he was right behind us.

Q:     Okay.  So what happened next?

A:     As we were still on Cape Road and right after he hit us, . . . . we made a right on 123, and then from 123 . . . we made a left turn to go southbound on 35, to go towards the police station, and Robert was still behind us at that time in my vehicle.  He came around the vehicle, got in front of us and made a complete stop, like for us to try to hit him.

       And then he just ended up turning into DCI Biologicals, which is where I work, and he left my car there and he took off from there. . . .

       The four students testified similarly concerning the incident.  Christopher Gunn, the driver of the Caliber, testified that Samaniego's car was "following us pretty close, closer than normal" and that this following distance did not seem to be safe.  When the other car hit his car, Gunn recalled, Gunn was driving "probably between 30 and 40" miles per hour.  When asked if the other car was bumping his car "hard enough to where you were afraid you might lose control of

6

your own car," Gunn testified, "Yes." When asked if he believed "that car was capable of causing you bodily injury or serious bodily injury or even death," Gunn testified, "For sure." A recording of Gunn's call to 911 during the incident was admitted into evidence and played for the jury. In the recording, Gunn can be heard screaming, "He's hitting us. Oh, my God, he just hit us," and, "He swerved. He's in front of us." The voices of the other occupants in the vehicle could also be heard screaming during the call.

Maria Torres testified that the driver of the other car "tried to sideswipe us when we were trying to get rid of him." When asked if she recalled the other car "bumping the bumper of the car," Torres testified, "Yeah, he hit Chris like maybe three or four times." Torres "thought [their] car was going to flip." When asked if she thought the other car was being used "in a way that could have caused you bodily injury or serious bodily injury or death," Torres explained,

> Yeah, because on the side, he tried to like hit on us. And like Chris had to like slow down the car because we were going fast because we were trying to get away from him. So Chris slowed down and he would like—forward. And so he almost hit us on the side, too. So I thought he was going to hit us and we were going to flip to the other side.

When asked how fast they were driving at the time, Torres was uncertain. However, she believed they "were speeding for sure" in an effort to get away from the other car and that their car "[was going] like maybe 75" miles per hour when they were hit. According to Torres, "the speed limit is like 50 [miles per hour] there."

Taylor Pickett testified that the other car "went from following us to getting extremely close behind us to the point where it was past following. It felt as if it was kind of threatening."

7

When asked if he recalled the other car "bumping into the car that Chris was driving," Pickett answered, "Definitely, yes." When that occurred, Pickett recalled, he was afraid "that our car would get run off the road, that we would get into a car accident, something would happen to us."

Ronald Chapman testified that the driver of the other car was "hitting" Chris's car, and he was afraid that "someone was going to get shot or we were going to get run over and wind up on the side of the road." When asked if he felt "that whoever was driving that car behind you was using that car as a weapon to somehow threaten you," Chapman testified, "Yes, exactly. That's how I felt."

Officer Michael Casillas of the San Marcos Police Department investigated the incident. Casillas took statements from Hernandez and the students after they arrived at the police station. The written statements of Hernandez, Gunn, Torres, and Pickett were admitted into evidence. Casillas also examined the cars that were involved in the incident for signs of physical damage to corroborate the statements. Casillas testified that when he examined the Caliber, he observed "indentions [sic] on [the] bumper that appeared to be made from bolts or screws on the front license plate of another vehicle." Casillas also examined the abandoned Stratus that had allegedly hit the Caliber. Casillas testified that the front license plate of the Stratus appeared "bent" and was "not straight. It's at a little bit of an angle, which, again, would lead me to believe . . . that this vehicle struck the rear end of the Dodge Caliber." Photographs of both cars showing the damage done to each were admitted into evidence.

The State elicited the following testimony from Casillas concerning whether a motor vehicle could be used as a deadly weapon:

Q:    Let me ask you this. Would a vehicle, motor vehicle, be capable of causing bodily injury to another person if that motor vehicle were used to ram another vehicle?

A:    Yes, sir, it can.

Q:    In other words, let's say that you're driving in Car A and I'm driving Car B. If I intentionally ram my car, Car B, into your car, Car A, is it possible that I could cause you serious bodily injury?

A:    Very much so.

Q:    If I were to intentionally ram your vehicle, you think you'd feel threatened from that?

A:    Yes, sir, I would.

On cross-examination, when asked if there was any "physical evidence" that corroborated Gunn's statement that the car was "struck so hard that he felt he was going to lose control of the vehicle," Casillas testified, "Not that I noticed, no, sir." Also, when the State asked Casillas if the damage to the license plate of the Stratus "could have happened anywhere at any time," Casillas answered, "It could have."

The only witness to testify for the defense was Samaniego, who denied hitting Hernandez in the parking lot and denied being in the car that was following Hernandez and the students. Samaniego testified that after Hernandez got out of the car at the restaurant, he exited the parking lot, intending to leave her there, but only drove "about 300 yards or something like that," before he felt guilty about leaving her and drove back to the restaurant. When he returned, Samaniego claimed, "nobody was there." He admitted that he eventually drove Hernandez's car to the parking lot of the business where she worked and abandoned it there.

9

We conclude that the above evidence is legally sufficient to support the jury's verdict. Hernandez and the students testified that the car Samaniego was allegedly driving, the Dodge Stratus, either "struck," "hit," or "bumped" from behind the car the students were driving, the Dodge Caliber. According to Torres, this happened "maybe three or four times." Gunn testified that the hits were hard enough that he was afraid he was going to lose control of the vehicle; Torres "thought the car was going to flip;" and Pickett was afraid that the car "would get run off the road" and that they "would get into an accident." Officer Casillas confirmed in his testimony that a motor vehicle that intentionally rams another vehicle is capable of causing serious bodily injury. The jury could have reasonably inferred that Samaniego had intentionally rammed the Caliber by hitting it multiple times. In the recording of the 911 call that was admitted into evidence, Gunn can be heard yelling that the other car was "hitting" them while the other occupants of the vehicle can be heard screaming in apparent fear. From this and other evidence, the jury could have reasonably concluded that the occupants of the Caliber were "actually endangered" by the manner in which Samaniego was driving the Stratus. Moreover, the testimony of Hernandez and the students was corroborated by evidence tending to show that the front license plate of the Stratus was bent and that the Caliber had "indentions [sic] on [its] bumper that appeared to be made from bolts or screws on the front license plate of another vehicle." Hernandez and the students further testified that their car was traveling between 30 and 40 miles per hour and "maybe," according to one of the students, much faster than that—possibly 75 miles per hour in a 50 miles per hour speed zone. The jury could have reasonably inferred that the Stratus was driving at least as fast as the Caliber in order to keep up with and ultimately hit it. There was also evidence presented that in addition to hitting the students'

10

vehicle, Samaniego's vehicle was following behind the other vehicle at an unsafe distance, "tried to sideswipe" the vehicle, and pulled out in front of it and "made a complete stop, like for us to try to hit him." Viewing this evidence in the light most favorable to the verdict, we conclude that the jury could have found beyond a reasonable doubt that Samaniego drove the motor vehicle in a manner that was capable of causing serious bodily injury or death. Thus, the evidence is legally sufficient to support the jury's deadly weapon finding.

Viewing the evidence in a neutral light, we similarly conclude that the evidence is factually sufficient to support the jury's deadly weapon finding. Samaniego focuses on the evidence tending to show that the car may have been "bumped" instead of "hit," that the damage to the cars appeared minimal, and that, according to Officer Casillas, there was no physical evidence corroborating Gunn's testimony that he could have lost control of the vehicle. However, it would not have been against the great weight and preponderance of the evidence for the jury to find that the damage to the car, however "minimal" it may have appeared, still supported the State's theory that Samaniego used his car to hit the other vehicle. Moreover, the defense presented no evidence tending to show that merely "bumping" the car while it was going at least 30 miles per hour was somehow less dangerous than "hitting" the car at that speed. Furthermore, despite the apparent lack of physical evidence, the jury could have credited Gunn's testimony that he could have lost control of the vehicle because Gunn, as the driver of the Caliber, was in the best position to know what was happening to his ability to steer the car while it was being hit from behind. Moreover, even if the jury had discredited Gunn's testimony, there was other evidence from other witnesses and sources, summarized above, tending to show that Samaniego drove the motor vehicle in a manner that was

11

capable of causing death or serious bodily injury.  Thus, we cannot say that the jury's verdict was "manifestly unjust" or "against the great weight and preponderance of the evidence."

We overrule Samaniego's first and second issues.

## CONCLUSION

We affirm the judgments of the district court.


_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed

Filed:   June 10, 2010

Do Not Publish

12